**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:                                                    Chapter 11

ABIDE BRANDS, INC., *et al.*,                    Case No. 6:24-bk-03075-LVV

                    Debtors.                          (Jointly Administered)[1]

### EMERGENCY MOTION TO MODIFY BID PROCEDURES ORDER

LTV SaaS Growth VIII, LLC ("LTV"), by and through its undersigned counsel, hereby moves, on an emergency basis, to modify this Court's Order Granting Debtors' Expedited Motion for (I) an Order Approving Bidding and Notice Procedures for the Sale of Substantially all of Their Assets; and (II) an Order (A) Authorizing the Sale of Assets; and (B) Scheduling Auction and Final Approval of Sale; and (C) Granting Certain Related Relief ("Bid Procedures Order") (Doc. No. 37) entered July 23, 2024, to:

(i)     Extend the Bid Deadline[2] for an extremely short period of time after the debtors fulfill their obligations to comply with reasonable requests for written due diligence materials made before the Bid Deadline; and

(ii)    Reduce the required Initial Bid amount to the actual amount not subject to a condition precedent to be paid by the Stalking Horse, specifically, $3,500,000.

In support thereof, LTV respectfully represents as follows:

---

[1] Jointly administered cases: Abide Brands, Inc., Case No 6:24-bk-03075-LLV and PayKickstart LLC, Case No. 24bk-03076-LVV.

[2] This motion incorporates by reference the definition of terms set forth in the Bid Procedures Order including the Bidding Procedures for the Assets appending thereto as **Exhibit A**.

**Introduction**

1.      Both before and after the debtors, Abide Brands, Inc. ("Abide Brands") and Paykickstart, LLC ("Paykickstart" and collectively the "Debtors"), filed their respective bankruptcy cases, LTV attempted diligently and in good faith to obtain information reasonably necessary for LTV to submit an offer for the Debtors' assets. In both instances, the Debtors delayed providing information and then, after such delays, only provided very minimal information insufficient for LTV to submit a formal offer without further due diligence conditions. Notwithstanding, prior to the bankruptcy filing, LTV submitted a Letter of Intent on June 17, 2024 (the "LTV LOI"), setting forth its initial proposed terms including a $2 million cash payment at closing and the assumption of $1.5 million of deferred payments. A copy of the LTV LOI is appended hereto as **Exhibit A**. Since, as more fully set forth below, the Debtors failed to comply with its obligations to comply with reasonable requests for information as required by the Bid Procedures Order, the Bid Deadline should be extended.

2.      Furthermore, the Initial Bid requirement in the amount of $4.5 million should be reduced because it does not reflect the actual value of the Stalking Horse's bid.

3.      These modifications to the Bid Procedures Order will ensure that a fair, reasonable and expeditious sale process takes place in order to maximize value for the benefit of the Debtors, their estate and creditors.

**Jurisdiction and Venue**

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.      The statutory predicates for the relief requested herein are sections 105 and 363 of the Bankruptcy Code and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

5.      No previous motion for the relief sought herein has been made to this Court.

### Factual Background

6.      On June 19, 2024 (the "Petition Date"), Debtors filed their respective petitions for reorganization under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their respective businesses and manage their assets as debtors-in-possession in accordance with their duties and responsibilities under the Bankruptcy Code.

7.      As set forth in the Joint Chapter 11 Case Management Summaries filed in the Chapter 11 cases of each debtor (Doc. No. 4 – Abide Brands; and Doc. No. 5 – PayKickstart), Abide is a Delaware corporation formed on May 10, 2022 which operates as an acquisition, management and holding company for software development companies. Abide Brands currently owns all outstanding interests in PayKickstart which it manages.

8.      PayKickstart is a software development company which provides e-commerce payment solutions for a wide variety of clientele.

9.      At some point in early 2024, Debtors apparently sought to engage in a sale transaction.

10.      In April, 2024, LTV learned about the possibility of a sale transaction with the Debtors through their secured creditor, Boopos Warehouse LLC ("Boopos"), who directed them to the Debtors' advisor, Corum Group Ltd. ("Corum").

11.      LTV contacted Corum and after entering into a Mutual Non-Disclosure Agreement received access to a data room which only contained minimal information concerning the Debtors.

12.     On April 29, 2024, LTV provided a specific list of additional due diligence materials that it requested to make an offer for the purchase of the Debtors' assets.

13.     On May 1, 2024, the various parties had an introductory call. The Debtors requested that LTV provide a prioritized data request list and LTV agreed.

14.     On May 2, 2024, LTV provided a prioritized data request list.

15.     Throughout this process, LTV continued to provide Boopos with updates on the status of LTV's potential sale transaction with the Debtors.

16.     Despite repeated follow-up communications, the Debtors continued to fail to provide the information LTV had requested.

17.     On May 16, 2024, Corum informed LTV that "the CEO has decided not to continue the process with LTV at this point. I will let you know if something changes." Corum then terminated LTV's data room access. LTV communicated these latest developments to Boopos.

18.     The following day, on May 17, 2024, Corum reset LTV's data room access. At that point, some but not all of the prioritized information requested by LTV had been added to the data room.

19.     The various parties had a call on May 20, 2024, during which LTV raised additional questions including concerning the structure of the transaction (cash payment, assumption of debt, deferred payments, etc.) and the Debtors' technology.

20.     On Wednesday, May 29, 2024, LTV contacted Corum and discussed the lack of progress that had been made in getting the information necessary for LTV to make an offer. Later that day, Corum emailed LTV and advised that "PayKickStart has decided to pull from the market and work on the business itself. They have decided they will not be selling in the near term. I'll keep you posted of any changes."

21.     LTV subsequently learned that, contrary to the forgoing representation by Corum, the Debtors intended to proceed with a sale transaction.

22.     Accordingly, LTV decided to prepare on offer and present it to the Debtors' sole secured creditor, Boopos.

23.     LTV also reached out to the prior sellers (the "Prior Sellers") of PayKickstart who sold their assets to the Debtors and were owed millions of dollars in seller financing.

24.     Between June 9 and June 13, 2024, LTV exchange terms of sale with Boobos and the Prior Sellers, and ultimately agreed upon the principal terms.

25.     On June 13, 2024, without any initiation on the part of LTV, the Debtors' principal, Jared Schneider emailed LTV and state that "we have not received any correspondence from LTV about a written offer or any consideration for the existing shareholders (and a convertible note that should be recognized). We'll be closing this process today and moving forward with a decision. Please advise."

26.     LTV prepared the LTV LOI based upon the terms agreed to by Boopos and the Prior Sellers. On June 18, 2024, LTV provided the LTV LOI to Boopos, with the expectation that Boopos and the Prior Sellers would present and highly recommend these terms to the Debtors. Boopos advised that it would discuss the LTV LOI with Mr. Schneider.

27.     On June 19, 2024, the Debtors filed their respective bankruptcy cases. The Debtors did not thereafter pursue a sale transaction with LTV.

28.     Instead, on June 26, 2024, the Debtors entered into a Letter of Intent with PayKickstart, LLC, a Florida limited liability company (the "Stalking Horse"), to purchase substantially all of their assets in exchange for $2 million cash due at closing, $1.5 million payable

over seven years, $100,000 on each of the second through sixth anniversary, and the $1 million balance due on the seventh anniversary of the Closing.

29.    The Letter of Intent also provided for the possibility of a transaction payment in the event the Stalking Horse sells substantially all of its assets in the future.  The transaction payment would equal the amount Abide Brands would have received had it owned a twenty percent (20%) interest in the Stalking Horse.

30.    Finally, the Letter of Intent precluded the Debtors from engaging in any additional discussions or negotiations with anyone other than the Stalking Horse concerning the possibility of a sale transaction, and precluded the Debtors from releasing any non-public information the purpose of which would be to assist in the preparation of an offer with respect to a sale transaction with the Debtors, until after the contemplated Bid Deadline.

31.    On July 3, 2024, the Debtors filed the Debtors' Motion for (I) an Order Approving Bidding and Notice Procedures for the Sale of Substantially all of Their Assets; and (II) an Order (A) Authorizing the Sale of Assets; and (B) Scheduling Auction and Final Approval of Sale; and (C) Granting Certain Related Relief (the "Bid Procedures and Sale Motion"). (Doc. No. 35)

32.    The Bid Procedures and Sale Motion sought, *inter alia*, the entry of the Bid Procedures Order which included the approval of the proposed Bidding Procedures.

33.    On July 11, 2024, this Court held a hearing to consider the Bid Procedures and Sale Motion and, in particular, the entry of the Bid Procedures Order and the approval of the Bidding Procedures contained therein.

34.    On July 23, 2024, by its entry of the Bid Procedures Order, this Court granted the relief requested with some slight revisions required by this Court including directing the Debtors to comply with requests for reasonable due diligence information notwithstanding the exclusivity

provisions contained in the Letter of Intent with the Stalking Horse. The Bid Procedures Order established August 7, 2024, as the Bid Deadline.

35.     That same day, July 23rd, LTV's counsel emailed Debtors' counsel introducing himself, explaining his client's interest in submitting a Qualified Bid, and requesting the proposed non-disclosure agreement.

36.     On July 24, 2024, the Debtors' counsel provided the proposed non-disclosure agreement, which LTV signed and returned directly to the Debtors' counsel on July 30, 2024, along with the due diligence materials request. LTV followed up with the Debtors' counsel on August 1st requesting the due diligence material, and again on August 2nd.

37.     LTV's counsel then called the Debtors' counsel on August 2nd at which time the Debtors' counsel for the first time requested a prioritized list of due diligence materials. The Debtors' counsel stated that they were working on setting up a data room with due diligence materials. The Debtors' counsel also stated that the Debtors were contemplating extending the Bid Deadline to provide sufficient time for competing bidders to review the due diligence materials and submit Qualified Bids.

38.     Later that day, on Friday, August 2nd, LTV provided the Debtors' counsel with a prioritized list of due diligence materials requested by LTV.

39.     Not having received any information or an invite to a data room, LTV followed up with Debtors' counsel on Monday, August 5th, and LTV's counsel left Debtors' counsel multiple phone messages inquiring as to the status of the due diligence materials requested and the extension of the Bid Deadline. The Debtors' counsel never responded.

40.     On August 7th, at 12:44 pm (the day of the Bid Deadline), LTV received an emailed invite for DueDiligence@ltv.fund. LTV did not see it at the time but, regardless, a matter of a few

hours was a grossly inadequate amount of time to review whatever materials had been uploaded to the data room and prepare the extensive materials necessary to submit a Qualified Bid by 5:00 p.m. later that day, including any redlined changes to the Asset Purchase Agreement.[3]

41.     On August 8th, the Debtors filed their Notice of (I) Designation of Successful Bidder and (II) Cancellation of Auction representing that "no Qualified Bids (as such term is defined in the [Bid] Procedures Order) were received by the Bid Deadline of August 7, 2024 at 5:00 p.m. (Eastern Time)." Such notice did not disclose any of the foregoing circumstances including Debtors' failure to comply with LTV's repeated requests for reasonable due diligence information.

42.     LTV continues to be extremely interested in submitting a Qualified Bid, has the financial wherewithal to submit a Qualified Bid and participate in a competitive bidding process, and fully intends to act expeditiously (as it has in the past) but obviously cannot do so without the Debtors' cooperation.

### Relief Requested

43.     Good cause supports modifying the Bid Procedures Order to extend the Bid Deadline and reduce the Initial Bid requirement, and such modifications are in the best interests of the Debtors, their estate and their creditors because these modifications will facilitate a fair, appropriate and competitive bidding process for the sale of substantially all of the Debtors' assets.

44.     This Court possesses the inherent authority to modify its own interlocutory orders. *Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227, 1231 (11th Cir. 2010) ("It is permissible for a district court to rescind its own interlocutory order."); *Hardin v. Hayes*, 52 F.3d 934, 938 (11th

---

[3] LTV first discovered the emailed invite on August 9th and when it attempted to access the data room such access was blocked. Consequently, LTV does not know what due diligence material had placed in the data room by the Debtors, if any.

Cir. 1995) (stating that a district court may reconsider and amend interlocutory orders at any time before final judgment); *Good Gateway, LLC v. NRCT, LLC (In re Bay Circle Props., LLC)*, Case No. 15-58440-WLH, Adv. Pro. No. 19-5284, 2022 Bankr. LEXIS 2001, at *5 (Bankr. N.D.Ga. July 21, 2022) (Hagenau, J.) (citing *Boyd v. Toyobo Am., Inc. (In re Second Chance Body Armor, Inc.)*, 434 B.R. 502, 504 (Bankr. W.D. Mich. 2010), for the proposition that: "It is widely recognized that trial courts have the inherent authority to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment. A trial court may modify, or even rescind, such interlocutory orders.") (citations and internal quotation marks omitted); *see also Fortran Group Int'l v. Tenet Hosps. Ltd.*, 543 Fed. Appx. 934, (11th Cir. 2013) ("the district court had the power to reconsider, revise, alter, or amend its summary judgment order prior to entering the final judgment") (citations omitted).

45.     The Bidding Procedures specifically required the Debtors to provide prospective bidders with reasonable due diligence materials:

> Upon request, Debtors shall afford each Bidder reasonable due diligence information equivalent to that supplied to the Stalking Horse Bidder. The due diligence period will end on the Bid Deadline (as defined below).

> Debtors shall give each potential bidder reasonable access to all written due diligence information provided to another potential bidder and shall provide substantially the same access to information to each bidder. Debtors reserve the right to require that potential bidders sign a form of nondisclosure agreement approved by the Debtors as a condition to receiving due diligence information. Debtors shall coordinate all reasonable requests for additional information and due diligence access from potential bidders and other professionals. No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

46.     Receipt of reasonable due diligence was critically important to each prospective bidder not only because it would inform them of whether and on what terms a Qualified Bid and subsequent bids (including monetary consideration) should be made, but because a Qualified Bid

could not be subject to any further condition relating to the completion of due diligence after the Bid Deadline.

47.     On July 30th, merely seven (7) days after the entry of the Bid Procedures Order, LTV promptly entered into the Debtors' required non-disclosure agreement and made its request for reasonable due diligence materials.

48.     The Debtors' counsel did not respond and on August 2nd LTV's counsel called Debtors' counsel only to learn that a data room had not yet been established and that, allegedly to facilitate the production of due diligence materials, LTV needed to prioritize their requested information. LTV's counsel also then learned that the Debtors were considering extending the Bid Deadline to provide sufficient time to prospective bidders to review the due diligence information (after provided by the Debtors) and submit a Qualified Bid.

49.     LTV complied with this request and later that same day (August 2nd) provided a prioritized list of requested due diligence information. The Debtors did not thereafter provide the requested information and the Debtors' counsel did not respond to multiple subsequent inquiries (by email and through telephone voice-mail messages) concerning the status of the due diligence materials and the Bid Deadline.

50.     On August 5th, the Debtors' counsel forwarded to LTV the limited financials that the Debtors had already filed in the bankruptcy case on June 28, 2024, which included some of the information requested by LTV, but the vast majority of information requested by LTV remained unproduced by the Debtors.

51.     On August 7th at 12:44 p.m. (the day of the Bid Deadline), LTV received an emailed invite for DueDiligence@ltv.fund. Unfortunately, LTV did not recognize the email at the time but

regardless it was far too late for LTV to review the materials (whatever was then added to the data room) and prepare everything required to submit a Qualified Bid by 5:00 p.m. that same day.

52.     Because the Debtors failed to comply with the due diligence access provisions of the Bid Procedures Order and because LTV reasonably, timely and diligently attempted to obtain such due diligence information from the Debtors, good cause exists to extend the bid deadline.

53.     This Court should also modify the Initial Bid requirement contained in the Bid Procedures Order to reflect the actual amount of monetary consideration to be paid by the Stalking Horse and excluding the extremely speculative Sale Transaction Payment.

54.     The Stalking Horse's bid consists in a Closing Cash Payment in the amount of $2 million and deferred payments totaling $1.5 million (payable over seven (7) years as provided for in the Unsecured Promissory Note), for a total $3.5 million.

55.     The Sale Transaction Payment (estimated by the Debtors to realize $1 million) is payable only in the event of a subsequent sale transaction and is only equal to what Abide Brands would have received had it retained a twenty percent (20%) interest in PayKickstart. These conditions are far too speculative to incorporate into the Initial Bid requirement. While the Sale Transaction Payment may, of course, be taken into consideration in determining the highest and best bid, it should not serve to discourage the submission of competitive Qualified Bids. Setting an Initial Bid requirement in an amount $1 million more than what the Stalking Horse in all likelihood will ever pay does exactly that.

56.     Regardless of whether the Debtors are entitled to some degree of deference in the exercise of their business judgment, the Debtors serve as trustees of their respective estates, *see* 11 U.S.C. 1107(a), and "[a] duty is imposed upon the trustee to maximize the value obtained from a

sale, particularly in liquidation cases." *In re Knott*, Case No. 6:12-bk-07764-KSJ, 2015 Bankr.

LEXIS 202, at *5 (M.D.Fla Jan. 20, 2015) (Jennemann, J.) (citations omitted).

> To ensure a trustee complies with his or her duties, a bankruptcy court is 'generally afforded wide latitude in deciding whether to grant or deny approval of estate asset sales.' Additionally, in appropriate circumstances, it is proper for a court to interfere with a proposed sale to safeguard the interests of parties concerned, such as creditors.

*Id*.

57.     The circumstances now presented to this Court establish the need for this Court to interfere with the sale process implemented by the Debtors. In order to leave open the possibility of maximizing value to a greater extent than presently offered by the Stalking Horse, the Bid Procedures Order should be modified both: (i) to extend the Bid Deadline to provide LTV with a full and fair opportunity to obtain reasonable due diligence material and submit a competing bid; and (ii) to reduce the Initial Bid requirement to $3.5 million to correspond to the actual amount of consideration committed to be paid by the Stalking Horse and not subject to a condition precedent. Such modifications will facilitate a fair, appropriate and competitive sale process and thereby ensure that value will be maximized for the benefit of the Debtors and their estate and creditors.

**WHEREFORE**, LTV respectfully requests that this Court modify the Bid Procedures Order as requested herein and grant such other and further relief as this Court deems just and proper.

Dates at Fort Lauderdale, Florida, this 14th day of August, 2024.

THE MOVANT,

LTV SAAS GROWTH VIII, LLC

/s

_____

Craig A. Pugatch (FL 653381)
LORIUM LAW
101 N.E. 3rd Ave., Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 462-8000
Email: capugatch@loriumlaw.com

*And*

Stephen M. Kindseth (pro hac vice pending)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Telephone: (203) 368-4234
Email: skindseth@zeislaw.com

*Its Attorneys*

# EXHIBIT A



LTV Fund
251 Little Falls Drive,
Wilmington DE, 19808
United States of America

June 17, 2024

Dear Jared,

On behalf of LTV SaaS Growth VIII, LLC ("LTV Fund" or the "Purchaser"), we're pleased to submit this Letter of Intent (the "Letter") setting out certain non-binding understandings and binding agreements among LTV Fund and Abide Brands Inc. ("Paykickstart" or "PKS" or the "Company" or the "Seller"), with respect to the proposed acquisition (the "Transaction") by LTV Fund or one of its subsidiaries of all or substantially all of the assets and liabilities of the Company ("Assets"), including those set forth on Exhibit A owned or used by the Company in connection with, or related to, the business of the Company (the "Business").

We are enthusiastic about the potential of working closely with you and the Paykistart team and we are excited about the possibility of acquiring Paykistart in a strategic move that aligns with our vision of revolutionizing e-commerce.

NON-BINDING PROPOSED TRANSACTION TERMS

1) *Structure and Purchase Consideration*

Subject to the results of our legal, financial, technical, and tax due diligence reviews, the structure we are proposing is as follows:

A. Seller effectuates a novation of its existing $3,400,000 note ("Previous Seller Note") with the previous owner of the Business ("Prior Seller") substituting a $200,000 note ("New Note") and up to $1,500,000 of deferred payments (the "Deferred Payments") as detailed below in lieu of the Seller Note;

B. Purchaser purchases the Assets (which include Seller's rights under its transactions with Previous Seller ("Prior Transaction Documents")) for $2,000,000 (the "Closing Cash") plus the assumption of the Deferred Payments (the "Purchase Price");

C. At the closing of the Transaction, the Closing Cash is used to pay off the New Note and the Seller's Boopos loan (up to $1,800,000; any shortfall will be payable by Seller at the closing such that the Boopos loan is extinguished in full);

D. Post-closing, Purchaser will be responsible for the Deferred Payments and will be in direct contractual privity with Prior Seller.

We believe the foregoing structure satisfies all parties' needs in the most efficient structure; effectively, Purchaser steps into Seller's "shoes", with Seller being relieved of its obligations and Prior Seller having an opportunity to receive further payments of purchase price towards the Business.

The Deferred Payments shall be as follows:

a. Five Hundred Thousand US Dollars ($500,000.00) ("Deferred Payment 1") will be paid twelve (12) months post-closing to the Previous Seller, contingent upon the business maintaining steady performance over the twelve (12) months following the closing date compared to the TTM period prior to the closing of the Transaction; and

b. Five Hundred Thousand US Dollars ($500,000.00) ("Deferred Payment 2") will be paid twenty-four (24) months post-closing, contingent upon the business maintaining steady

LTV Fund
251 Little Falls Drive,
Wilmington DE, 19808
United States of America



performance over the twenty-four (24) months following the closing date compared to the TTM period prior to the closing of the Transaction; and

c. Five Hundred Thousand US Dollars ($500,000.00) ("Deferred Payment 3") will be paid thirty-six (36) months post-closing, contingent upon the business maintaining steady performance over the thirty-six (36) months following the closing date compared to the TTM period prior to the closing of the Transaction.

As part of this offer, Matt Callen and Mark Thompson will enter into a separate agreement with the buyer that includes a VIP tiered partnership. This agreement will outline terms and conditions that provide an opportunity for Matt and Mark to earn a percentage of the Monthly Recurring Revenue (MRR) generated by new customers they bring in. The specifics of this arrangement will be detailed in the partnership agreement, ensuring flexibility for both parties to revisit and adjust the terms based on performance and mutual agreement.

Other terms and conditions:

Training and Transition Terms:
- within the initial ninety (90) days following the closing of the Transaction, document and provide detailed Standard Operating Procedures (SOPs) for the ongoing operations of the business; and
- for the first ninety (90) days post-closing, provide training for a period of thirty (30) hours per week; followed by a commitment to provide training for twenty (20) hours per week from the end of this initial period up to the sixth (6th) month post-closing; and
- the transition of the team will be under the Buyer's control, with LTV Fund retaining full discretion to decide which team members will transition, as well as the terms of their employment post-transition.

The foregoing training and transition will be provided by the principals of Seller and Previous Seller as further identified in due diligence.

The purchase price set forth above assumes that the Company will (i) have a normalized working capital at the closing of the Transaction and (ii) be acquired free of any excess cash and any indebtedness, debt-like items, liabilities, or other long-term, unusual, or extraordinary liabilities.

2) *Working Capital*
At the closing of the Transaction, the Business will be delivered with a mutually agreed upon normalized level of Net Working Capital (the "Net Working Capital Target").

The Base Amount may be adjusted at closing based on the Net Working Capital Target and will be trued up 90 days after the closing.

For purposes of the Transaction, Net Working Capital will be defined as current assets (excluding cash) less current liabilities (including deferred revenue), in each case determined in accordance with Generally Accepted Accounting Principles (GAAP).

3) *Source of Cash / Financing*
The purchase price will be funded with capital from LTV Fund.

4) *Timetable and Closing*
Upon acceptance of this Letter, we would expect to complete our final confirmatory diligence work and close the Transaction within 30 days.

LTV Fund
251 Little Falls Drive,
Wilmington DE, 19808
United States of America



The closing of the transaction will be subject to certain conditions, including, but not limited to, (a) the transaction has been approved by all appropriate corporate actions of the Purchaser and the Seller; (b) all required approvals, consents, and authorizations of state and federal regulatory authorities have been received; (c) all required consents of third parties have been received; (d) Previous Seller and Boopos will have consented to the structure of the Transaction and participated as appropriate, and (e) the Purchaser has completed a due diligence review of the Assets and the Business satisfactory to the Purchaser in its sole discretion, including the Prior Transaction Documents (in the event the Prior Transaction Documents are not satisfactory, the closing will be contingent on Purchaser and Previous Seller agreeing to any necessary amendments).

The closing of the Proposed Acquisition (the "Closing") shall be held on such date (the "Closing Date") and at such time that the Purchaser and the Seller agree to the conditions set out in Paragraph 4. The funds in the amount of two million US Dollars ($2,000,000.00) (the "Upfront Consideration") are secured via an escrow account holder ("Escrow"), with the initial target closing date being July 17, 2024. Upon Closing, the Seller shall fully and completely transfer to the Purchaser all rights, interest and good and marketable title to said Assets, free and clear of any and all liens, charges and encumbrances. Upon receipt of which the inspection period shall commence and at or before its expiration the Purchaser shall instruct Escrow to release the Purchase Price to the Lender and Previous Sellers in accordance with Paragraph 1.

5) *Management*
We believe in the strength of the Company's management team and the importance of their continued involvement with the business. Accordingly, we anticipate formalizing employment arrangements (including contracting arrangements) for key team members to be determined on the terms and conditions that are mutually acceptable to LTV Fund and each of such employees/contractors (including an annual compensation to be agreed and an incentive and retention bonus for each such key team members if applicable), and consistent with LTV Fund's employment and contracting practices, including without limitation, LTV Fund's standard non-competition and non-solicitation agreement.

6) *Other Customary Terms and Conditions*
The Company, the equity holders of the Company (each, an "Owner" and collectively, the "Owners"), and LTV Fund will enter into a definitive agreement for the Transaction and other ancillary agreements with terms satisfactory to all parties. The definitive agreement for the Transaction will include customary representations and warranties of each party, certain restrictive covenants, including noncompetition and non-solicitation restrictions on the Company, Previous Sellers and the Owners for a period of 5 years, and customary indemnification obligations to be borne jointly and severally by the Company and the Owners. Appropriate documentation will also be entered into between Seller and Previous Seller as well as Purchaser and Previous Seller as needed to effectuate the proposed structure.

The representations and warranties will survive the Closing for a period of 24 months; provided, however, that the fundamental representations and warranties (as described below) will survive indefinitely or for a maximum period permitted under the applicable statutes of limitation.

Subject to our confirmatory diligence review, we expect the fundamental representations and warranties to include representations regarding organization and authority/capacity, authorization, capitalization, title to assets, tax matters, intellectual property matters, information technology, and privacy laws.

The obligations of the Company and the Owners with respect to indemnification for breaches of representations and warranties (other than fundamental representations and warranties) will be subject to the following limitations: (i) a tipping basket equal to 1% of the Reps and Warranties amount and (ii) a maximum limit on liability equal to 100% of the Reps and Warranties amount. The foregoing



limitations will not be applicable to any breach of any fundamental representation and warranty or any fraud, willful misconduct or intentional misrepresentation; provided, however, that the maximum limit on liability for breaches of fundamental representations and warranties will be capped at 100% of the purchase price.

For purposes of determining whether there has been a breach of a representation, warranty, agreement, or covenant, and for purposes of determining the amount of losses resulting therefrom, all references to materiality qualifiers, including Material Adverse Effect qualifiers, in the representations, warranties, agreements and covenants will be disregarded.

## BINDING AGREEMENTS

7) *Due Diligence Requirements*
   Our willingness to enter into definitive documentation for a Transaction is conditioned upon satisfaction with the results of due diligence. Key areas of our diligence include:
   - meeting with the management team to discuss the future prospects of the Business;
   - detailed review of historical financial data and management projections;
   - the Company and the Owners working with LTV Fund's financial planning and analysis team prior to closing to develop an 18-month post-closing budget for the Business;
   - review of the Business' existing customer base and relationships;
   - review of regulatory environment and any past legal issues;
   - discussions with key partners and customers at the appropriate time;
   - detailed technical due diligence;
   - management reference calls and background checks;
   - satisfactory review of the Prior Transaction Documents; and
- customary legal, accounting, technology and tax due diligence.

Following the execution of this Letter by all of the parties, with reasonable advance notice from LTV Fund to the Company, the Company, and the Owners shall, and shall cause the officers, employees, advisors, and agents (collectively, "Representatives") of the Company to, afford LTV Fund and its Representatives full and free access to all premises, properties (including, without limitation, all source code), books, records (including tax records), contracts, and documents (including, without limitation, financial, operating, and other data) owned or used by the Company, as well as to the Company's independent accountants, legal counsel, and employees and customers, in order to permit LTV Fund to make such investigation of the business, properties, and operations of the Business as LTV Fund may deem appropriate.

8) *Conduct of Business*
   Until the termination of this Letter in accordance with its terms, the Company shall conduct all of its business affairs in its usual and ordinary course and, without limiting the foregoing, shall (a) pay its accounts payable and other obligations in the ordinary course of business consistent with past practice, (b) use commercially reasonable efforts to maintain intact its existing business organization and its customer, supplier and subcontractor relationships, (c) keep LTV Fund advised of any significant developments affecting, involving or related to the Company or the Business, (d) not, without prior notice to LTV Fund, declare or pay any dividends or distributions of any kind to the Owners that are outside of the ordinary course of business or inconsistent with past practice, (e) not, without the prior written consent of LTV Fund, make any loans or advances to any of its officers, directors or employees, except in the ordinary course of business, (f) not, without the prior written consent of LTV Fund, change or alter any employment or consultant agreement, increase the compensation payable to management (including wages, salaries, commissions, bonus opportunities or commitments or any other remuneration), or adopt or modify any employee benefit plan, (g) not, without the prior written consent of LTV Fund, issue, sell, or become contractually obligated to issue or sell, any equity, debt or other

LTV Fund
251 Little Falls Drive,
Wilmington DE, 19808
United States of America



security of the Business, (h) except in the ordinary course of business, not, without the prior written consent of LTV Fund, sell, or become contractually obligated to sell, any assets owned or used by the Company, and (i) not, without the prior written consent of LTV Fund, enter into any commitment for capital expenditures in excess of $10,000, leased property or business acquisitions.

9) *Confidentiality*

Prior to the execution of the definitive agreement, the parties to this Letter will not disclose and will cause their respective Representatives not to disclose, to any third party any information regarding the existence of this Letter, the terms of the proposed Transaction, or the existence of or status of negotiations with respect to the proposed Transaction without the prior consent of LTV Fund and the Company, except that disclosures may be made (a) by LTV Fund and the Company (and the Owners) to those of their respective Representatives as need to know such information for the purpose of evaluating or negotiating the proposed Transaction and (b) to the extent required by applicable law, regulation or legal or administrative process.

10) *Exclusivity*

The Company and the Owners shall work diligently and in good faith toward negotiating and executing a definitive agreement as soon as practicable. The Company and its Representatives shall, for a period of 90 days from the date of execution of this Letter (the "Exclusivity Period"), work exclusively with LTV Fund toward the signing of definitive documentation for the Transaction. During the Exclusivity Period, the Company, the Owners and their respective Representatives (i) shall immediately cease any existing discussions or negotiations with any person other than LTV Fund conducted prior to the date hereof with respect to a potential alternative transaction (whether contemplated as an acquisition or licensing of all or any portion of the assets owned or used by the Company or acquisition of any equity securities of the Company, whether by equity purchase, merger, consolidation, tender offer, an equity or debt financing or otherwise) (an "Alternative Transaction"), (ii) shall not, directly or indirectly, take any action to solicit, initiate, encourage (including by way of furnishing information) or assist the submission of any proposal, negotiation, or offer from, or engage in negotiations or discussions with, any person or entity (other than LTV Fund), or engage in any similar actions, relating in any way to an Alternative Transaction, (iii) shall notify LTV Fund promptly if it receives any inquiries from any third parties in regard to an Alternative Transaction (including disclosing the name of the party and the salient terms of the inquiry, including price). The Company shall not unreasonably withhold its consent to extend the Exclusivity Period for one additional period of 30 days in order to allow the parties to finalize and enter into definitive documentation for the Transaction.

11) *Representation and Warranty*

The Company and the Owners represent and warrant to LTV Fund that (a) neither the Company nor any Owner has entered into any agreement pursuant to which any person or entity has obtained the right to acquire any portion of the equity interests of the Company or the assets owned or used by the Company and (b) the execution, delivery, and performance of this Letter by the Company does not and will not breach, violate, conflict with, or permit the cancellation of, any agreement to which the Company or any Owner is a party or by which the Company or any of its properties is bound.

12) *Transaction* Expenses

The parties to this Letter shall each pay their own transaction expenses, including the fees and expenses of financial advisors, attorneys, accountants, and other advisors, incurred in connection with the Transaction contemplated herein.

13) *Governing Laws and Jurisdiction*

This Letter and any disputes associated with this Letter shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (regardless of the laws that might otherwise govern under applicable principles of conflicts of law). Each of the parties to this Letter consents to the non-exclusive



jurisdiction of the courts of any state or federal court sitting in the State of Delaware in the event of any litigation arising out of, in connection with, or with respect to, this Letter.

14) *Termination*

This Letter (a) may be terminated at any time by LTV Fund, on the one hand, or the Company and Owners, on the other hand, in the event that the definitive agreement has not been executed by all parties by the expiration of the Exclusivity Period, including any extensions thereof, as set forth in Section 10 of this Letter, or (b) shall be terminated upon execution of the definitive agreement.

15) *Miscellaneous*

Sections 7 through 15 of this Letter (collectively, the "Binding Paragraphs") shall be legally binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

The rights and obligations of any party to this Letter under the Binding Paragraphs may not be assigned by any party without the prior written consent of the other parties, except that LTV Fund may make any such assignment to a subsidiary of LTV Fund without the prior consent of the other parties.

The Binding Paragraphs constitute the entire agreement between the parties and supersede all prior oral or written agreements, understandings, representations and warranties and courses of conduct and dealing between the parties on the subject matter thereof.

The Binding Paragraphs may be amended or modified only by a writing executed by all of the parties hereto.

Except for the Binding Paragraphs, (i) this Letter, including Exhibit A, is (A) a nonbinding indication of interest; (B) not a commitment or a promise of performance; and (C) subject in all respects to the consummation, execution, and delivery of a definitive agreement mutually acceptable to all parties; (ii) this Letter does not set forth all the terms and conditions that may be set forth in the definitive agreement related to the potential Transaction but provides a framework for negotiation and discussion of such terms; (iii) the parties hereto shall not, in any circumstances, rely on any terms or conditions that may be set forth herein; and (iv) this Letter shall not in any circumstances constitute the basis of a contract nor legal obligations between the parties.

Please indicate your agreement to the terms of this Letter by executing below. At LTV Fund's election, this Letter will be null and void if it has not been executed by all parties and returned to LTV Fund before 5:00 p.m., Eastern Standard Time, on June 19, 2024.

Please feel free to contact any of the LTV Fund staff listed below with any questions or feedback.

Marina Vizdoaga                                    marina.vizdoaga@ltv.fund

We very much appreciate this opportunity.
Sincerely,

LTV SAAS GROWTH VIII, LLC

By: *Marina Vizdoaga*
Marina Vizdoaga
VP of Investments

LTV Fund
251 Little Falls Drive,
Wilmington DE, 19808
United States of America

LTV
SaaS Growth Fund

ACCEPTED AND AGREED:

COMPANY:

Abide Brands Inc.

By:_____
Name:  Jared Schneider
Title:  Chief Executive Officer

OWNER:

_____
Name: Jared Schneider 100%

LTV Fund
251 Little Falls Drive,
Wilmington DE, 19808
United States of America



## Exhibit A

### Assets and Liabilities to be included in the Transaction

**Purchased Assets:**  The assets to be purchased will include, without limitation, (i) all Company intellectual property, including, without limitation, trade secrets, software, hardware, the underlying source code, and any copyrights, trademarks, trade names, brands or other goodwill associated therewith and rights related thereto, all domainnames owned by the Company; (ii) customer lists; (iii) the Contracts (as defined below); (iv) accounts receivable; and (v) the Company's inventory, if any, and other fixed assets (including, without limitation, furniture, servers, laptops, equipment, trade show booths, etc.) in the Business at the closing of the Transaction.

"Contracts" shall include, without limitation, in each case subject to LTV Fund's due diligence, the following contracts, leases, and other agreements: (a) contracts with existing Company clients; (b) contracts with existing Company vendors; (c) out-bound licenses of the Company's intellectual property and other assets to third parties; (d) in-bound licenses of intellectual property and other assets used by the Company; (e) real estate leases for all Company properties and (f) rights under the Prior Transaction Documents.

**Assumed Liabilities:**  The liabilities to be assumed (the "Assumed Liabilities") shall include the following: (i) the post-closing obligations of the Company to perform under the Contracts that are assumed or to make payments to the extent included in item (ii) below, (ii) the current liabilities of the Company taken into account in computing the consolidated working capital of the Company as of the closing date as described in Section 2 above and (iii) liabilities of the Company that are customarily assumed by buyers in transactions of this type and that the parties mutually agree will be assumed liabilities and which are set forth on a schedule to the definitive agreement.